**Hays Estate**

Before Klein, Adam, J., Lefever, Saylor, Shoyer, Pawelec and Silverstein, JJ.

CHARLES KLEIN, Adm. J., April 5, 1972.—I. Minis Hays died at the age of 78 years on June 5, 1925, leaving a will and codicil by which, inter alia, he bequeathed and devised his residuary estate to his executors and trustees, in trust to collect the income and

"ITEM I(c) . . . to divide and pay over the amounts in hand in equal shares to such of my children as may then be living and the issue of such of them as may then be dead, such issue taking and dividing equally among themselves such share only as his, her or their parent of parents would have taken if living at the time of my death, for and during the full period of the respective lives of such children and their issue—the share of income of any child or grandchild dying childless to go to and be divided among the survivors of the class until the death of the last survivor; subject, however, so far as the participation of a grandchild or grandchildren are concerned, to the right and power of the parent by last will and testament to direct, limit and appoint the share or portion of income which shall be enjoyed by each grandchild or his or her issue; and in default of such appointment or limitation the distribution of income is to be equal among such grandchildren or their issue, *per stirpes* and not *per capita.*"

The testator provided further:

"ITEM II. Should all or any of my children die leaving children or grandchildren, I give, bequeath and devise the principal of my estate to such children or grandchildren in equal shares *per stirpes* and not *per capita.*

"In the event of the entire extinction of my inheritable blood through the death of my last surviving child or grandchild, without leaving issue capable of taking the principal, then upon the final Trust that the entire corpus or principal of my said individual estate shall be held by my said Trustees or their successors in the trust for the benefit of the AMERICAN PHILOSOPHICAL SOCIETY, Held at Philadelphia for Promoting Useful Knowledge, its successors and assigns . . ."

Testator was survived by four children, namely, Elizabeth Elliot Sinclair, Sarah Minis Goodrich, Annie Bradford Norris and George Wood Hays.

The reason for filing the present account is the death of Sarah Minis Goodrich, the last surviving child of testator, on November 29, 1970. None of testator's four children ever had children so that at the time of the death of Sarah Minis Goodrich there were no living descendants of I. Minis Hays. Thomas Reath and the First Pennsylvania Banking and Trust Company are stated to have been appointed executors of the Estate of Sarah Minis Goodrich.

The accountants have presented for adjudication a question whether the gift of the residue to the American Philosophical Society under ITEM II is valid under the rule against perpetuities.

Elizabeth Elliot Sinclair, Sarah Minis Goodrich and Annie Bradford Norris, testator's three daughters, provided in their wills, in substantially identical language, that if the gift of testator's individual residuary estate to the American Philosophical Society should, for any reason, be held void or ineffective, their respective shares of such residuary estate should, nevertheless, be given to said society. George Wood Hays, decedent's son, in his will, left the residue of his estate to charities other than the American Philosophical Society.

It is settled beyond question or the need for citation of authorities that the determination of whether a gift violated the rule against perpetuities at common law was determined by possible and not actual events. This historic rule was changed with the enactment of section 4 of the Estates Act of April 24, 1947, P. L. 100, 20 PS §301.4, which sensibly provided that the rule is to be measured by actual rather than possible events. This statute is applicable only to conveyances effective on or after January 1, 1948, and provides that the existing law shall remain in full force and effect as to conveyances prior to that date. Since testator died in 1925, the validity of the gift to the American Philosophical Society must be ascertained by possible and not actual events.

Mr. Bregy, in behalf of the executors of the son's estate, contends that the gift of the residue to the American Philosophical Society, upon the death of testator's "last surviving child or grandchild," is invalid because it is well within the realm of possibility that after testator's death one of his children would have a child who would survive all lives in being by more than 21 years. He, therefore, argues that the gift violates the rule against perpetuities and, hence, an intestacy occurs, with the result that the residue passes in equal shares to the estates of testator's four deceased children. Mr. Duane, appearing for the American Philosophical Society, challenges this contention and maintains that the gift of the residue to the society is valid.

Since testator's three daughters bequeathed any share of the residue that they might receive by reason of the possible invalidity of the gift to the society, it would receive three-fourths of the residue in any event, regardless of the outcome of this litigation. If the gift to it is held to be invalid, the estate of the deceased son

would be entitled to receive a one-fourth share of the residue.

Testator provided for an equal division of the income among his children living at the time of his death and issue of deceased children, per stirpes. The gift of income to the issue of testator's children who predeceased him was subject "to the right and power of the parent by last will and testament to direct, limit and appoint the share or portion of income which shall be enjoyed by each grandchild or his or her issue." The income was payable to the children and the issue of a deceased child entitled thereto for and during the full period of their respective lives. In the event of a child or grandchild dying childless, his share of the income was "to go and be divided among the survivors of the class until the death of the last survivor."

With respect to the principal, testator provided that if all or any of his children should die leaving children or grandchildren, the principal was given "to such children or grandchildren in equal shares *per stirpes* and not *per capita*." Testator provided, further, that "In the event of the entire extinction of my inheitable blood through the death of my last surviving child or grandchild, without leaving issue capable of taking the principal," then the principal was to be held in trust for the benefit of the American Philosophical Society.

If the issue presented to us for determination was to be decided under the provision of the Estates Act of April 24, 1947, we would have no difficulty, because on the date of testator's death he was survived by four children who were all childless and no issue of a child who had predeceased him. Hence, the income was distributable in equal shares to his four children for their respective lives and the gift of income to issue of

children never became operative. However, since possibilities and not actualities control under the common-law rule in ascertaining whether a gift violated the rule against perpetuities, it must be conceded that the language used by testator is not free from doubt or ambiguity.

In construing testator's language, we are duty bound to give it a meaning which would prevent an intestacy if reasonably possible. The presumption is that a testator intends to dispose of his entire estate and not die intestate as to any part of it: Vandergrift Estate, 406 Pa. 14 (1962); Rouse Estate, 369 Pa. 568 (1952); Carmany Estate, 357 Pa. 296 (1947); Duffy's Estate, 313 Pa. 101 (1933).

Gray, The Rule Against Perpetuities, sec. 633, after stating that the rule is in derogation of testator's intent, states:

"When the expression which a testator uses is really ambiguous, and fairly capable of two constructions, one of which would produce a legal result, and the other a result that would be bad for remoteness, it is a fair presumption that the testator meant to create a legal rather than an illegal interest . . . Therefore the fact that a provision would be too remote, if construed in a certain way, is a reason for supposing that it was not intended to be construed in that way, which although it cannot avail against a clear form of words, may well be held to govern when the expression is ambiguous."

This is also the Pennsylvania rule. In James' Estate, 245 Pa. 118, 127 (1914), the court said:

"It is true . . . that the rule against perpetuities is one of law and not of construction, further, there is authority . . . that every part of a will should be read as though the rule did not exist and 'then to the provisions so construed the rule is to be remorselessly

applied' . . . But notwithstanding these general principles, this court held in Coggins' App., . . . that 'Where the language of a will leaves us in doubt whether this rule has been transgressed, we may well resolve the doubt in favor of vesting (the remainders within the required time), especially when, upon a careful examination of the whole will, we may reasonably infer such to have been the intent of the testator.' "

The public policy of Pennsylvania has been clearly demonstrated by the adoption of the Estates Act of 1947, which makes actualities at the end of the period, rather than possibilities at the creation of the interest, govern. The common-law rule against perpetuities is harsh, inflexible and often leads to ludicrous results. The courts in this State have, over the years, nibbled away at the rule to ease the inexorable rigidity of medieval jurisprudence. For examples, see Quigley's Estate, 329 Pa. 281 (1938), in which the Supreme Court reaffirmed the rule that valid life estates are to be upheld even though the ultimate remainder seems obviously void, and Harrah Estate, 364 Pa. 451 (1950), in which the court enunciated a principle which it said may be called "vertical separability" and held that remainders to children living when testator died were valid and separable from a remainder of a possibly "after-born" child. We, therefore, believe that the courts should endeavor to support Pennsylvania's public policy and decide in favor of the validity of remainders in doubtful cases, whenever reasonably possible.

We must approach the problem before us for determination keeping in mind the basic principles of law applicable to the interpretation of testamentary writings which have been so well set forth by former Chief Justice Bell in Burleigh Estate, 405 Pa. 373, 376 (1961):

"It is now hornbook law (1) that the testator's intent

is the polestar and must prevail; and (2) that his intent must be gathered from a consideration of (a) all the language contained in the four corners of his will and (b) his scheme of distribution and (c) the circumstances surrounding him at the time he made his will and (d) the existing facts; and (3) that technical rules or canons of construction should be resorted to only if the language of the will is ambiguous or conflicting or the testator's intent is for any reason uncertain."

Our study of this will from its four corners leads us to the conclusion that the gift of the residue to the American Philosophical Society is valid and does not violate the rule against perpetuities. There can be no question that a gift of income to a child for life, the principal to go to such child's "children or grandchildren in equal shares *per stirpes* and not *per capita*" upon the child's death is a valid gift. If there is a violation of the rule in this case, it arises from the gift to the issue of children who may be dead when testator died. The gift of the income at testator's death was "to such of my children as may then be living and the issue of such of them as may then be dead." We construe this language to mean that only such issue of a deceased child who were living on the date of testator's death were eligible to receive a share of the income and only for the period of their lives. Upon the death of the last survivor of such issue, the gift of the income terminated and the principal represented by that share of income became distributable. This, too, is clearly a valid disposition which does not transgress the rule.

It is when we try to determine what happens to the principal at this point that we run into difficulty. We are required to construe the language of the will so as to impute to testator's words a meaning that will conform to his probable intention and be most agreeable to reason and justice. See Hunter's O. C.

Commonplace Book, Wills, sec. 2(q), and the cases cited therein.

The fact that the gift is to a class of an indeterminate number does not affect the issue. The number of lives mentioned in determining whether a gift transgresses the rule is immaterial, provided all are in being at the creation of the interest; a remainder to take effect upon the death of the last survivor of a class living at testator's death is valid: Bender v. Bender, 225 Pa. 434 (1909); Stephens v. Dayton, 220 Pa. 522 (1908). "It matters not how many lives there may be so that the candles are all burning at the same time, for the life of the longest liver is but a single life": Smith's Appeal, 88 Pa. 492, 495 (1879).

There can be little doubt that testator intended to give his residuary estate to the American Philosophical Society if he was not survived by "inheritable blood." This term is defined in Black's Law Dictionary, Revised Fourth Edition, as "blood which has the purity (freedom from attainder) and legitimacy necessary to give its possessor the character of a lawful heir; that which is capable of being the medium for the transmission of an inheritance."

Testator was careful not to step beyond the limitations of the rule against perpetuities in the gifts of income, and we think it is reasonable to assume that he sought to be just as careful in the disposition of principal.

What did testator mean by using the word "inheritable" in describing his "blood"? If he had said "in the event of the entire extinction of my blood" and omitted the word "inheritable" there would be more force to the argument of the representatives of the deceased son, because it would indicate testator meant an indefinite extinction of all of his descendants without restriction. But we cannot ignore the use of the word "inheritable."

We are duty bound to endeavor to give it meaning. A will must be so construed, if possible, as to give effect to every word employed by testator and a construction which renders any of the words nugatory and futile must be rejected: Vandergrift Estate, supra; Keffalas Estate, 426 Pa. 432 (1967); Benedum Estate, 427 Pa. 408 (1967). In our opinion, the clause "in the event of the entire extinction of my inheritable blood" must be construed to mean blood which is capable of being the medium for the transmission of inheritance. By so doing, we must perforce exclude from the class included in "inheritable blood" any issue who are barred from taking principal by reason of the operation of the rule against perpetuities. Thus, the meaning of "last surviving child or grandchild," which is descriptive of the class designated as "inheritable blood," must be construed so that the ultimate gift does not transgress the rule.

The conclusion we have reached that the gift to the American Philosophical Society is valid is supported by testator's use of the disjunctive in disposing of the remainder.

In Lippincott's Estate, 333 Pa. 48, 54 (1939), the late Justice (later Chief Justice) Horace Stern, speaking for a unamious court, said:

". . . Moreover, where a testator provides that a remainder is to vest upon the happening of either of alternative contingencies, one of which violates the rule against perpetuities while the other does not, the bequest will be held valid if the contingency happens which does not violate the rule. (Whitman's Estate, 248 Pa. 285, 289, and cases there cited; Gray on Perpetuities, secs. 341-353.)"

In the instant case, Mr. Bregy argues that testator's language "In the event of the entire extinction of my inheritable blood through the death of my last surviv-

ing child or grandchild, without leaving issue capable of taking principal, then . . ." the principal to be held in trust for the American Philosophical Society violates the rule because testator might have had issue born beyond the permissible period. We think there is no merit to this contention. We cannot disregard the disjunctive word "or" used by testator and construe it as if testator had used the conjunctive word "and."

The word "or" is prima facie and ordinarily and customarily used to indicate an alternative: Burleigh Estate, supra. In Golden's Estate, 320 Pa. 4, 7 (1935), the court quoted with approval the following statement found in Griffith's v. Woodward, 1 Yates 318:

"Courts of justice will transpose the clauses of a will and construe 'or' to be 'and' and 'and' to be 'or' only in such cases when it is absolutely necessary so to do to support the evident meaning of the testator, but they can not arbitrarily expunge or alter words without such apparent necessity."

See also Whitman's Estate, 329 Pa. 377 (1938); Simpson's Estate, 304 Pa. 396 (1931). This is obviously not a case for such transposition.

Since the gift over to the society "In the event of the entire extinction of my inheritable blood through the death of my last surviving child . . .", the first of the two alternatives, creates a valid gift which does not violate the rule, we are duty bound under the decisions to disregard completely the possibly invalid alternative gift.

As we have hereinbefore stated, testator died on June 5, 1925. His will was dated October 22, 1921, and was, in effect, republished by a codicil executed on April 17, 1924, which was a little over a year before his death when he was 77 years of age. At that time, his three daughters ranged in ages from 44 to 50 years and his son, George, was 39 years of age. All were

childless. While the legal possibility of children being born to parents of any age must be conceded, the fact that testator's daughters were beyond the usual and customary child bearing age, and his son, George, was over 39 years of age and had no children, lends strength to the conclusion that testator had in mind at his death only children who would in all probability survive him. See Wright's Estate, 284 Pa. 334 (1925).

We are comforted in the fact, although it is not pertinent to our conclusion, that under our ruling the residue of this estate goes to the American Philosophical Society with which decedent was closely associated and held in high esteem, rather than to charities selected by a son who died without issue in Michigan, 30 years ago.

For all of these reasons, we find that the gift of the residue to the American Philosophical Society under ITEM II of the will is a valid gift . . .

Another question submitted to the auditing judge for adjudication is whether Sarah Minis Goodrich, the individual cotrustee, was entitled to commissions in view of the following provision at the end of the last paragraph of ITEM VIII of the will:

"I direct that the custody and care of the securities, and the collection of the income of my estate and of my wife shall devolve upon the corporation-executor and trustees, and to them only shall compensation be paid for services rendered."

Mrs. Goodrich was appointed executor and trustee to act with the First Pennsylvania Banking and Trust Company under testator's will. While the corporate fiduciary received commissions as executor, Mrs. Goodrich did not.

Credit was taken in the account for principal commissions of 4 percent, or $33,410.10, paid to the First

Pennsylvania Banking and Trust Company and Thomas Reath, trustees under the will of Sarah Minis Goodrich. In the notice sent to all parties in interest, it was stated that the First Pennsylvania Banking and Trust Company has withdrawn its claim for principal commissions and an appropriate adjustment will accordingly be made in the awards.

At the audit, Mr. Bregy, on behalf of the National Bank and Trust Company, Ann Arbor, Mich., successor administrator c.t.a. for the estate of George Wood Hays, opposed the payment of these principal commissions to the trustees of the estate of Mrs. Goodrich. In view of our conclusion that Mr. Bregy's client has no interest in the residue of this trust, it is clear that he has no standing to object to such commissions. However, we deem it advisable under the circumstances in this case to pass upon the merits of the claim.

What did testator mean when he wrote "to them only shall compensation be paid"? The word "them" obviously refers to "corporation-executor and trustees," which eliminates principal commissions to Mrs. Goodrich as executor. It does not, in our view, eliminate her claim to principal commissions as trustee. The word "corporation" clearly applies only to the word "executor," and "trustees" is in the plural form and can only mean both trustees. Therefore, "them" as applied to the trustees must include Mrs. Goodrich.

In addition, the limitation is "compensation . . . for services rendered" which can only refer to "the care and custody of the securities, and the collection of income." There is no limitation in the will on compensation for the general investment responsibility of a trustee. We think it clear that Mrs. Goodrich's estate is entitled to be paid for her services involving the exercise of trustees' duties of investment and sale of securities. For

such services, the claim of one percent appears quite modest in view of the fact that the trust has been running for 45 years. That claim is hereby approved . . .

And now, April 5, 1972, the account is confirmed nisi.

*J. Horace Churchman,* for accountant.

*Philip A. Bregy, Franklin L. Best, Jr.,* of *McCoy, Evans & Lewis,* for exceptants.

*Morris Duane,* of *Duane, Morris & Heckscher,* for American Philosophical Society.

*Paul William Putney,* for exceptant.

*Judith J. Jamison,* for the Commonwealth.

## OPINION SUR EXCEPTION

SAYLOR, J., July 14, 1972.—There are two questions before the court which have been carefully briefed and argued by counsel for exceptants and for the charity to which the learned auditing judge awarded the income of the trust estate because of the death of testator's last surviving child. That death meant the extinction of issue of the testator as no child of his ever had issue.

These questions are: 1. Did the court err in interpreting testator's words "inheritable issue" as excluding from a class those who as members would cause a gift to the class to violate the rule against perpetuities? and 2. Was the court in error in finding that testator stated alternative contingencies which would avoid application of the rule?

The critical language of the will reads as follows:

"In the event of the entire extinction of my inheritable blood through the death of my last surviving child or grandchild, without leaving issue capable of taking the principal, . . ."

The learned auditing judge said in his adjudication:

"In our opinion the clause 'in the event of the entire extinction of my inheritable blood' must be construed to mean blood which is capable of being the medium for the transmission of inheritance. By so doing we must perforce exclude from the class included in 'inheritable blood' any issue who are barred from taking principal by reason of the operation of the rule against perpetuities. Thus, the meaning of 'last surviving child or grandchild,' which is descriptive of the class designated as 'inheritable blood,' must be construed so that the ultimate gift does not transgress the rule."

Exceptants interpret the words "inheritable blood" differently than does the auditing judge. They contend that "inheritable blood" means legitimate blood or blood free of the stigma due to the attainder of an ancestor or due to other action of the law of the long past that would adversely affect the right to inherit.

Clearly, testator had no such ancient matters in mind when he employed the words "inheritable blood." In his concern that the provisions he made for his issue would be effective and that he could be assured that such issue would take, he must have had in mind the rule against perpetuities and the need to avoid its application. What other reason could he have had to employ the words "inheritable blood"?

The auditing judge gave full consideration to the intention of testator that issue entitled to take under his will should be such as could inherit without a violation of the inheritance law. The auditing judge has fully considered all of testator's words and has given full value thereto. In so doing, he did not strain those words improperly. He interpreted them consistently

with the language of the will as taken from its four corners.

As to the question of alternative contingencies, exceptants assert that testator did not employ phraseology adequate to justify the court in finding that he stated alternative contingencies. Counsel argues that the word "or" in the dispositive clause means "and" because testator referred to the extinction of a class, which includes both children and grandchildren, by a single event, namely the death of the last survivor of that class. Hence, counsel argues that the alternative contingency doctrine has no application. But counsel incorrectly reads the phraseology as if the words were "my last surviving child *and* grandchild."

The word "or" indisputably evidences a clear intention of testator to provide an alternative contingency just as certainly as he could have done by using the words "In the event of the entire extinction of my inheritable blood through the death of my last surviving child or in the event of the entire extinction of my inheritable blood through the death of my last surviving grandchild." By the use only of the word "or," testator created an alternative which brought his testamentary provisions within the area where the permissible exception to the application of the rule against perpetuities comes into play.

Nevertheless, counsel argues that it is not enough for a testator merely to make an alternative gift on two separate contingencies. He must himself have separated it so as to make it take effect on the happening of either of two events. This, testator had done although he did not say precisely that the gift to the charity was "contingent upon the death of my last surviving child without issue or the death of my last surviving grandchild without issue." Exceptants argue that had testator spelled out the alternatives in that

fashion, the gift would be valid if all of his children die without issue, as actually happened.

In the light of holdings by the Supreme Court in cases such as James's Estate, 245 Pa. 118, 127 (1914); Quigley's Estate, 329 Pa. 281 (1938), and Harrah Estate, 364 Pa. 451 (1950), in which that court, in the words of the auditing judge, "nibbled away at the rule to ease the inexorable rigidity of medieval jurisprudence," we agree with him that remainders to children living when testator died were valid and separable from a remainder of a possible "after-born" child.

Hence, it is our conclusion that testator did create by the words he actually used an alternative contingency and that on the death of his last surviving child the American Philosophical Society became entitled to receive the income from the trust principal. The contingency occurred which did not violate the rule.

As contended by counsel for the American Philosophical Society, the intention of testator to benefit that institution, upon the extinction of issue which under the law could inherit, is clearly and in considerable detail set forth in the will. This intention should be given full consideration in expounding the will.

While it is clear that the common-law rule against perpetuities is applicable here, it is proper to interpret the language of the will as providing an exception to its application in that testator created an alternative contingency that would not violate the rule. It was proper for the auditing judge to award the income from nine-tenths of the principal to that charity which testator incontrovertibly intended to receive his bounty upon the extinction of his issue. The death of his last surviving child leaving no issue caused that result, as no child of testator ever had issue.

A careful reading of the record and the comprehensive and excellent briefs of counsel leads us to the

unanimous conclusion that the learned auditing judge thoroughly considered the questions presented and did not err in making the award for the benefit of the American Philosophical Society.

However, for tax reasons, the accountant trustees have excepted to the award of one-tenth of income made pursuant to the provisions of ITEM II of the will. Under the Federal Tax Reform Act of 1969, income from that part of the principal would be subject to income tax, thus reducing the amount of income otherwise available and consequently impairing the intention of testator in providing for the accumulation of income. The accountants refer to the Charitable Instruments Act of Pennsylvania of June 17, 1971 (No. 23), which provides that the governing instrument of any charitable organization (which includes a charitable trust) shall be deemed to include provisions the effect of which is to require distribution for each taxable year to be made in such wise as not to subject the organization to tax under the Federal Tax Reform Act.

In its statement of proposed distribution, the accountants asked that the award of the one-tenth be suspended so that the court at a later time can pass upon the question as to how the trustees should handle testator's direction to accumulate now that the Federal Tax Reform Act of 1969 is in effect. This exception is sustained and the adjudication is to that extent modified.

We have fully considered the exceptions relating to the award of income from the other nine-tenths of principal and the briefs in support of them and have come to the conclusion that those exceptions should be dismissed. They are dismissed and the adjudication, except as herein modified, is confirmed absolutely.